UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :   No. 3:18CR90(JAM)
                                :
          vs.                   :
                                :
SAMUEL DIAZ,                    :
                                :   New Haven, Connecticut
                    Defendant   :   January 22, 2019
                                :
- - - - - - - - - - - - - - - - x


SENTENCING


      BEFORE:

         THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.



A P P E A R A N C E S:


      FOR THE GOVERNMENT:

            OFFICE OF THE UNITED STATES ATTORNEY
                  450 Main Street
                  Hartford, Connecticut 06103
            BY:  BRIAN P. LEAMING, AUSA


      FOR THE DEFENDANT:

            LAW OFFICE OF MARGARET P. LEVY
                  P.O. Box 370128
                  West Hartford, Connecticut 06137-0128
            BY:  MARGARET P. LEVY, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

**10:11 A.M.**

1

2          THE COURT:  We're here today for sentencing in

3     the matter of United States of America v. Samuel Diaz.

4          May I have appearance of counsel for government,

5     please.

6          MR. LEAMING:  Good morning, Your Honor.  Brian

7     Leaming on behalf of the United States.

8          THE COURT:  Good morning.

9          MS. LEVY:  Good morning, Your Honor.  Margaret

10    Levy representing Samuel Diaz who is seated beside me.

11         THE COURT:  Mr. Diaz, are you doing okay today?

12         THE DEFENDANT:  Good morning, sir.  Yes, I am.

13         THE COURT:  Good morning.

14         Sir, do you have any family members or friends

15    here?

16         THE DEFENDANT:  I do.  I have my family members

17    here.

18         THE COURT:  Who is here, if they'd like to be

19    identified?

20         THE DEFENDANT:  My mother.

21         THE COURT:  Where is your mom?

22         THE DEFENDANT:  There (indicating).

23         THE COURT:  Okay.

24         THE DEFENDANT:  My sister right behind her.

25         THE COURT:  Is that Sandra?

1          THE DEFENDANT:  My mother, Carmen Diaz; my

2    sister, Sandra Lopez; my brother-in-law, Ray Lopez; my

3    fiancée, Johanna Vega; and the mother of my children,

4    Kristal Maldonado.  My father is outside somewhere.

5          THE COURT:  Welcome to all of them.  Okay.

6          So please be seated.

7          On October 3, 2018, Mr. Diaz appeared before the

8    Court for purposes of entering a plea of guilty to a

9    charge of conspiracy to distribute heroin and fentanyl.

10          A Presentence Report has been prepared by our

11    probation officer, Mr. Ryan Togninalli.  Thank you for

12    your work on the report in this case.

13          I want to make sure you understand, Mr. Diaz,

14    what I'm going to review today.

15          I have some pretty technical matters that I have

16    to go through with the attorneys mostly, a little bit with

17    you.

18          After that, I'm going to hear from Ms. Levy on

19    your behalf.  You're welcome, if you'd like to, to make

20    any statement that you'd like to.  Of course, I've

21    received your letter and letters from other family members

22    and supporters.

23          Then I'll hear from Mr. Leaming in terms of the

24    government's views concerning sentencing.

25          And Ms. Levy, if you have anything you want to

1    say in response to Mr. Leaming, you're welcome to do so,

2    okay?

3              MS. LEVY:  Thank you.

4              THE COURT:  So in terms of what I've reviewed,

5    I've looked at all that's been filed on the docket in the

6    case.  That principally includes the plea agreement, the

7    Presentence Report and addendum, the parties' respective

8    sentencing memos with their attachments.

9              Anything else the parties think I should have

10   reviewed?

11             MR. LEAMING:  I don't believe so, Your Honor.

12             MS. LEVY:  No, I don't believe so.

13             THE COURT:  All right.

14             Mr. Diaz, have you read the Presentence Report

15   and the addendum to the Presentence Report?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Have you discussed them with

18   counsel?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Now, at this point are there any

21   kind of factual objections apart from legal issues?  Any

22   factual objections in the Presentence Report?  I noticed

23   one date issue that it looks like in Paragraph 40 in the

24   criminal history computation it looks like May 15, 2013,

25   should be March 15, 2013.  Other than that, do the parties

1    have any objections to the factual statements?

2              MR. LEAMING:  Not by the government, Your Honor.

3              THE COURT:  Ms. Levy?

4              MS. LEVY:  Your Honor picked up something which

5    I didn't, which you've just mentioned in Paragraph 40.

6    And I do not have any corrections.

7              THE COURT:  I'll adopt the Presentence Report as

8    amended with that date correction as far as the factual

9    statements.

10             In terms of the guidelines calculation, the

11   Presentence Report proposes a final offense level of 17

12   under the Sentencing Guidelines and a criminal history

13   category of V.  And that would correspond, I believe, to a

14   recommended range of imprisonment of between 46 to 57

15   months of imprisonment; that could be followed by a

16   recommended term of supervised release of three years; and

17   the criminal fine recommendation is from the minimum

18   $10,000 to $1 million criminal fine, although that's,

19   of course, based on ability to pay any fine at all; and a

20   $100 special assessment.

21             I think that there might be some dispute or some

22   arguments that you have for a departure or variance from

23   the guidelines there, but is there a dispute concerning

24   the correctness of the Sentencing Guidelines calculation?

25             MR. LEAMING:  The government concurs with the

1    PSR, Your Honor.

2              MS. LEVY:  I have tried calculating the criminal

3    history a number of different ways.

4              THE COURT:  All right.

5              MS. LEVY:  And I agree that the PSR has

6    apparently correctly calculated Criminal History

7    Category V, although it is our expectation that we will be

8    arguing for a non-guidelines sentence below the 46 months

9    based on a number of factors.

10             THE COURT:  So I'm going to adopt the

11   Presentence Report's guidelines calculation, but I would

12   like to hear from you, Ms. Levy, about that issue in terms

13   of your argument, I think it's essentially

14   overrepresentation of criminal history on the basis of the

15   two convictions that occurred in 2006 at about the time

16   when Mr. Diaz was 18.

17             MS. LEVY:  That's correct.

18             I believe, although I'm not positive that I'm

19   recalling correctly, that the second of those convictions

20   may have been when he was 19 but in the very early months

21   of his turning 19, and that those two convictions,

22   distressing as they are for anyone looking at the behavior

23   of a young man, really get to a point where they

24   overrepresent his criminal history and that if they were

25   not given the full three points each, then he would be

1    falling in a lower criminal history category and therefore

2    a lower sentencing guidelines.

3              THE COURT:  So I think your argument's not so

4    much that I guess that he was under 18, because he was 18

5    at the time, but I think, as I understand it, I'm focusing

6    here, especially on Paragraph 32 and 33 of the Presentence

7    Report, essentially, one, in Paragraph 32 there's a sale

8    of drugs or narcotics for which there was a sentence

9    imposed that would have been suspended of four years.

10   Some months later there's another sale of narcotics for

11   which there's a sentence ultimately imposed of four years

12   jail concurrent to the term of it looks like the probation

13   revocation that occurred on December 15.

14             So maybe I should be clearer about the factual

15   scenario as I understand it as painted here.  Essentially

16   here we have an arrest in May of 2006 for drug selling.

17   It looks like another arrest or a sentence for that, I

18   should say, in October of 2006, five months later.  About

19   maybe six weeks later at the end of November of 2006 after

20   having received a four-year jail suspended sentence,

21   another arrest yet again for selling drugs.  And then it

22   appears that that arrest results in a probation violation

23   in December of 2006.  That means that the four-year jail

24   suspended that had been given now becomes four years

25   actual jail time.  And then as a result of that new

1   conduct that occurred in November of 2006, it looks like

2   in March of 2007 the state court imposes a four-years jail

3   time again concurrent.  So basically we have two drug

4   selling episodes, it looks like, from 12 years ago for

5   which Mr. Diaz receives a total of four-years jail time,

6   much of which he serves as recounted in the Presentence

7   Report.  But these two terms are concurrent.

8          Here's my concern about this.  They're

9   concurrent, however, the criminal history ends up tagging

10  him with three for each one of these instances.

11          MS. LEVY:  That's my concern.

12          THE COURT:  And put differently, I guess, had he

13  not been arrested the second time, that first sentence of

14  four-years jail suspended wouldn't have counted even at

15  all.  Now, of course it's an aggravating fact, I fully

16  understand, that he's arrested a second time, just been

17  sentenced in October of 2006 for that, given a break at

18  that point in time, and then back at it weeks later in

19  November of 2006.  I still look at this and I'm wondering

20  whether there's something to the argument that assessing 6

21  points of criminal history points for all of this episode

22  rather than 3 points, I wonder whether that's a little bit

23  overrepresentative of criminal history.

24          Is that your basic argument?

25          MS. LEVY:  I believe that it is.

1            I would also point out, for what it's worth,

2   that Mr. Diaz's birthday is November 12.  So that those

3   two incidents, which admittedly occurred and he pled

4   guilty to them, did occur within a short period of time

5   when he was 18 for the first and then 18 just a few weeks

6   from the second.  Given the family background that's

7   outlined throughout the PSR and throughout our arguments,

8   I think that the Court has hit on an issue, which is a

9   reasonable one, that given those points really overstates

10  the criminal history.

11            THE COURT:  Okay.  So he turned 19 on

12  November 12, 2006.  Okay.

13            MS. LEVY:  That's correct.

14            THE COURT:  Mr. Leaming, do you have anything on

15  this point?

16            MR. LEAMING:  I guess my interpretation of it,

17  Your Honor, is a little bit more serious.  Notwithstanding

18  the defendant's young age at the time, I would note that

19  he was also on probation at the same time for what many

20  would consider a serious offense for evading

21  responsibility with respect to apparently leaving the

22  scene of an accident involving an injury.  As the Court

23  noted, on October 18, 2006, he was given a break on both

24  cases, the both the sale of narcotics and the evading and

25  was given a chance of not serving a day in jail and being

1   placed on probation as well as, I guess as part of the

2   evading, to perform 300 hours of community service.  About

3   five weeks later, he committed the very same offense

4   again.  So it certainly looked to me like, well, the break

5   he got in October of 2006 was not appropriately given to

6   him, and so probation was violated on both the evading and

7   the sale.  He got a year in jail on the evading, but

8   because it was only a year, he doesn't score any points

9   for that.

10          I think the significance of all of that,

11  Your Honor, is that we're not looking at these things in

12  isolation.  We look at, okay, wait a minute, he gets out

13  of jail, discharged from his sentence, it looks like he

14  was out on parole in 2009 and discharged 2010 from his

15  sentence, and in 2013 he's selling drugs again.  So the

16  government believes that it's properly scored.  Certainly

17  the argument can be made by Counsel that a sentence under

18  the guidelines range is appropriate.  Obviously, the

19  government does not agree with that.  But I think the

20  points are there.  I think the Court has properly

21  calculated the Sentencing Guidelines.  I don't think

22  there's a legal basis to depart based upon an

23  overrepresentation, given the fact that he's committed

24  other offenses of a similar nature more recently, he was

25  given an opportunity to avoid jail but didn't even last

 1    five weeks, and therefore I think they're all properly

 2    scored in accordance with the guidelines manual.

 3              THE COURT:  All right.  Thank you.

 4              So I'm going to -- I continue to have some

 5    concerns here about the degree to which the criminal

 6    history category reflects so strongly what occurred at

 7    that time when he was 18, turning 19 at that time.  And

 8    I'm going to -- I'm going to factor that into the sentence

 9    that I ultimately impose, I should say, as a mitigating

10    factor here.  So I do intend to vary in terms of looking

11    at that with respect to the sentence that the Court would

12    otherwise impose.

13              MS. LEVY:  Thank you, Your Honor.

14              THE COURT:  Otherwise, I think it's unquestioned

15    that the guidelines calculation is technically correct

16    here.

17              MS. LEVY:  And we don't disagree with that.

18              One thing I would suggest would be helpful in

19    terms of a transcript eventually is that the Court has

20    referred to Paragraphs 32 and 33, and that refers to the

21    addendum to the Presentence Report.  The paragraphs are

22    numbered quite differently in the original Presentence

23    Report and in the addendum.  And I certainly think that in

24    terms of this issue of criminal history, the Paragraphs 32

25    and 33 of the addendum are the relevant paragraphs.

1          THE COURT:  Of the addendum?  You've lost me.

2          MS. LEVY:  Of the addendum.

3          THE COURT:  I have just the final Presentence

4    Report I think in front of me here.  I apologize.  I'm not

5    sure I have an addendum that has Paragraphs 32 and 33.  Do

6    you mean the final Presentence Report?  There's an initial

7    draft and then the final.

8          MS. LEVY:  What I have received and believe the

9    Probation documents show are a Presentence Report filed

10   11/20/18, Document 208 on the docket, and then an addendum

11   to the Presentence Report filed 12/19/18, Document 219-1.

12         THE COURT:  That's the final Presentence Report.

13         THE PROBATION OFFICER:  Correct, Your Honor.

14         THE COURT:  So the way it works in federal cases

15   is the Court orders an initial draft of the Presentence

16   Report.  And then the parties have 14 days to respond,

17   file objections to the Presentence Report.  Then the

18   probation officer files something called a final

19   Presentence Report.  I think that what you're referring to

20   is not an addendum to the Presentence Report, however, it

21   might be labeled on some sort of docket entry, but it's

22   actually the final Presentence Report which I've been

23   referring to; is that correct?

24         MS. LEVY:  Yes, although it is labeled Addendum

25   to the Presentence Report.

1          THE COURT:  It's labeled on what?

2          MS. LEVY:  If I may approach and show first to

3     the probation officer and then to the Court.

4               (Pause.)

5          THE COURT:  I'd like to move on past this very

6     technical issue.  Can we agree that there was a document

7     filed on December 19, 2018, that looks like a Presentence

8     Report and has Paragraphs 32 and 33 that refer to these

9     convictions at issue in 2006?

10         MS. LEVY:  Yes.

11         THE COURT:  I think that that solves that.

12         All right.  In terms of the conditions of

13    supervised release, the Court, as a matter of course,

14    would intend to impose in terms of conditions on

15    supervised release the standard conditions under 5D1.3(c),

16    the mandatory conditions under the statute which of course

17    include principally to not commit another federal state or

18    local offense and drug testing conditions, but also there

19    are special conditions that are identified in I believe

20    Paragraph 104 of the Presentence Report.  I believe that

21    one is for a search condition; another is for substance

22    abuse treatment; another is not to possess a firearm,

23    ammunition or other dangerous weapon; and another one is,

24    I think it may be the subject of dispute, not

25    communicating or otherwise interacting with any known

1    member of the Latin Kings gang.

2              So before I get to the Latin Kings gang proposed

3    special condition, Mr. Levy and Mr. Diaz, have you

4    reviewed the other special conditions there in the

5    Presentence Report?  Are there any concerns about those?

6              MS. LEVY:  Yes, we have.  Mr. Diaz is nodding

7    his head up and down that he agrees that we've reviewed

8    them and they are very much standard conditions of federal

9    supervised release, and I have no objection to those.

10             THE COURT:  And what about the interaction with

11   any known member of the Latin Kings gang, do you have an

12   objection to that?

13             MS. LEVY:  Only so far as that may be construed

14   by Probation to prevent Mr. Diaz from contact with his

15   fiancée, Johanna Vega, who is sitting here in the

16   courtroom.  The probation officer did a home visit while

17   Mr. Diaz was still at Wyatt and very strongly implied in

18   his description of the home that there were Latin Kings

19   symbols involved and that both the names of Vega and Diaz

20   were displayed with what the probation officer took to be

21   Latin Kings insignia.  Certainly there's no indication or

22   proof or even allegations specifically that Ms. Vega is a

23   member of the Latin Kings, but it seems to me that we are

24   in a better position to address that proposed condition

25   today than we may be several years from now if another

 1    probation officer who has simply gotten the case --

 2            THE COURT:  Would it be satisfactory then simply

 3    to say this condition does not apply to Johanna Vega?

 4            MS. LEVY:  Yes.

 5            THE COURT:  Otherwise, there would no objection

 6    to the condition?

 7            MS. LEVY:  No.

 8            THE COURT:  All right.

 9            Any objection from the government?

10            MR. LEAMING:  No, Your Honor.

11            THE COURT:  All right.  So I intend to do that.

12            That's, of course, not the Court's finding that

13    Ms. Vega is part of the Latin Kings.  I'm just saying in

14    case there were a misunderstanding or something in the

15    future about that, it would be clear that he could

16    continue to associate with Ms. Vega.

17            MS. LEVY:  Thank you.

18            THE COURT:  So I think that's it in terms of the

19    technical matters I have to review.

20            Ms. Levy, would you like to proceed?

21            MS. LEVY:  Thank you.

22            Mr. Diaz, from the very beginning of this case,

23    indicated to me that he was prepared to plead guilty, that

24    he had been involved in distribution of drugs, that he had

25    been at that time a member of the Latin Kings, he didn't

1    deny any of that.  He also was straightforward about his

2    prior convictions, that, yes, he had been drug addicted

3    since he began at 12 years of age with use of marijuana

4    and then went on to numbers of different drugs, including

5    ecstasy and Molly which may appear to be the same drug.

6    I've tried to inform myself of that, although it appears

7    that the street terms for Molly indicate that it is a more

8    serious drug than ecstasy which was developed earlier.

9         If someone looks at both of the sentencing

10   memoranda, ours for the defense and the one that the

11   government has prepared, it looks as if we're talking

12   about two different people.

13        THE COURT:  Can I just ask you, just on the drug

14   addiction issue --

15        MS. LEVY:  I'm sorry?

16        THE COURT:  The drug addiction issue.  You

17   mentioned something about drug addiction; do you remember

18   saying that?

19        MS. LEVY:  Right.

20        THE COURT:  In Paragraph 65 of the Presentence

21   Report, it talks about drug addiction and it states that

22   he was smoking marijuana until his arrest for this case.

23   It says that he tried heroin one time in 2013 but has

24   never used it again.  It says, as to Molly or ecstasy, I

25   think it says he used it only until 2013 and denied using

1   it after coming out of jail from the 2013 arrest.  And

2   that he occasionally used cocaine, say, at parties.  So

3   the picture I have -- and correct me if I'm wrong -- is

4   not somebody who at the time that he's arrested for this

5   case is under a heroin addiction, he's not using any

6   fentanyl.  He's smoking marijuana every day basically, but

7   it's not clear from what I have here in the Presentence

8   Report that there's anything else going on with drug

9   addiction at the time that he's arrested in this case.

10  Would that be right?

11          MS. LEVY:  May I have a moment?

12          THE COURT:  Yes.

13              (Pause.)

14          MS. LEVY:  That's correct.

15          THE COURT:  Is that right?  So this isn't one of

16  these cases where -- I have these cases where somebody

17  comes into court and basically they're selling to feed

18  their addiction for something very serious.  This is a

19  case in which somebody is selling to make money for kind

20  of other reasons as far as I can tell.  Maybe Mr. Diaz

21  will correct me in this respect, but I don't think I have

22  a case where he's selling to essentially feed a drug

23  addiction.

24          MS. LEVY:  Certainly not to feed a heroin

25  addiction, which may be the kind of addiction that we

1    picture as the most compelling.  My understanding, from my

2    discussions, is that over the years Mr. Diaz was involved

3    in sales of drugs in order to supply, to feed the various

4    kinds of drugs that he was using at various times,

5    although at the time of his arrest while he was on

6    probation, and we're aware that there have been criminal

7    history points added because this most recent arrest was

8    while he was on probation, he tells me he was trying very

9    hard to cut back on other kinds of drugs, but was still

10   using marijuana.

11              THE COURT:  Okay.  Thank you.  Please proceed.

12              MS. LEVY:  In general, looking at the

13   government's sentencing memorandum and at the defense

14   memorandum, it appears that we're talking about two

15   different persons.  The family involvement, the care for

16   the children both of Mr. Diaz and Ms. Maldonado, who are

17   his two biological sons, and their caring for the children

18   of Ms. Vega paints a picture of him, accurately I take it,

19   as someone very concerned about family, very concerned

20   because of the lack of supportive fatherly parenting in

21   his own life to someone who really wants to make an effort

22   to treat the next generation better than he was treated.

23   And he gives credit to his mother who is here in the

24   courtroom for doing the very best she could when she had

25   physical problems of her own, she had substance abuse

1   problems of her own, and there are reports in the PSR of

2   Mr. Diaz's caring for her mother while she was suffering

3   from colon cancer.  And that person appears to be very

4   much at odds with the picture that the government presents

5   of a drug dealer who is involved with Latin Kings who are

6   violent, who do gun battles on the streets of Hartford.

7   But it's interesting to note that none of the violent

8   activities which are described at length in the

9   Presentence Report attribute Mr. Diaz as a participant.

10  The April 28 shoot-out which left Mr. Claudio apparently

11  unconscious in a hospital for several months, there's no

12  mention, there's no claim that Mr. Diaz had anything to do

13  with that.

14          We're not denying that at that time he was a

15  member of the Latin Kings and may have at that time been

16  responsible for distributing drugs.  He's addressed that

17  issue in his letter to the Court.  But I think that rather

18  than seeing the two pictures which we've drawn of him as

19  being irreconcilable, basically what we have is a young

20  man who is going through all of this at the same time;

21  he's devoted to family, he's attempting to help family,

22  and he has gotten involved with selling drugs, very

23  serious drugs.  There is no claim that he himself was

24  addicted to heroin or to fentanyl.  And despite the fact

25  that he now looks at that period as having been one that

1    severely damages the community, he was involved in that

2    and was involved in both aspects.

3           From the letters that have been received from

4    the Wyatt Detention Center, it's clear that he has been

5    involved in their program to educate 14- to 18-year-olds

6    from the community, I take it that means the Central Falls

7    community, which is also a community of very poverty

8    stricken minority members.  And Mr. Diaz has been

9    considered to be a choice as an instructor and to give

10   advice to folks of that sort.  He's also been taking part

11   in discussions with a counselor at Wyatt, largely dealing

12   with issues of family, of missing family.  I think these

13   are all 183 and 553(1) kinds of issue which the Court can

14   and should take into consideration in forming a sentence.

15   We do not have a quarrel with the amounts or types of

16   drugs.

17          I've been doing this a long time and I've

18   represented many young men, and numbers of them have said

19   I'm going to change my life when I get out.  Nobody can

20   guarantee, but I think Mr. Diaz has a very substantial

21   good chance of making that happen.  He has an employment

22   record that doesn't look that impressive compared to

23   someone who has been holding a job for 10 or 15 years, but

24   he was full-time employed and getting very good job

25   reports and recommendations at the time of his arrest.

1    What I say to my clients now is that by the time they are

2    released from federal court, there will be more job

3    opportunities in the community for people who have been

4    formerly incarcerated.  There will be job opportunities

5    with small companies founded by other individuals who have

6    been formerly incarcerated, and there will be more

7    understanding and acceptance in the general public and the

8    general business community of people who have been

9    convicted and incarcerated.  And I believe that Mr. Diaz

10   has a very good likelihood of being able to take advantage

11   of that kind of job situation in order to help provide for

12   his family when he comes out.

13            I would indicate that -- excuse me just one

14   moment.

15            In terms of denial of federal benefits, Mr. Diaz

16   certainly comes under the category of someone having been

17   three times convicted of drug trafficking, but even under

18   that category he should be entitled to participate in

19   federally funded long-term drug treatment, which he

20   certainly needs, and into certain of the categories that

21   are provided as soon as the government opens up at some

22   point for individuals who do have that kind of record.

23   And so I would ask that the Court specifically order that

24   Mr. Diaz be entitled to whatever federal benefits are

25   available to him.

1           THE COURT:  I should enter a -- it's a little

2    premature, isn't it?  What kind of order exactly would I

3    enter?

4           MS. LEVY:  I'm sorry, I'm searching for the

5    specific statute, and am not finding it.

6           THE COURT:  Well, you've cited in your memo

7    21 U.S.C. 862.

8           MS. LEVY:  And it appeared to me that the first

9    disclosure of the PSR was referring to denial of federal

10   benefits in a way much more severe than is required under

11   the statute.

12          THE COURT:  I'm not sure with this sentence I

13   need to enter something about his eligibility or not for

14   particular federal benefits until I know what benefits

15   he's applying for.  But if it were an issue during the

16   term of his supervised release, for instance, it could be

17   re-raised with the Court if that were an issue with

18   respect to a particular program.  Part of the conditions

19   of supervised release would be drug treatment.

20          MS. LEVY:  Correct.

21          THE COURT:  So that would, I think, mean that he

22   safely would be able to participate in drug treatment

23   programs and not be excluded from them.

24          MS. LEVY:  Fine.

25          THE COURT:  Would you agree?

```
 1              MS. LEVY:  Yes.
 2              And I know that Mr. Diaz would like to address
 3  the Court in addition to the letter which he wrote to the
 4  Court several months ago which was mentioned by the
 5  probation officer in the PSR, was mentioned again in my
 6  sentencing memorandum, and I would say is one of the
 7  strongest and most heartfelt disclosures by a defendant of
 8  his acknowledgment of the wrong that he's done, the
 9  problem that creates for the community, and his wish to
10  apologize for that wrong.
11              THE COURT:  Okay.  Thank you.
12              And if any of his family members as well want to
13  address the Court, they're welcome to do so if Mr. Diaz
14  wants them to.
15              THE DEFENDANT:  Good morning once again,
16  Your Honor.
17              THE COURT:  Mr. Diaz, come on up to the lectern
18  if you'd like, please.
19              THE DEFENDANT:  Good morning once again.
20              THE COURT:  Good morning.
21              THE DEFENDANT:  Thank you for allowing me to
22  speak.
23              First, I would like to apologize to the
24  prosecution, to the courts, and most importantly to my
25  family for putting them through so much, and to my
```

1    community where I've caused despair and destruction that
2    I'm ashamed of today.

3         I want to personally take the time to thank my
4    attorney for her representation as well.

5         Your Honor, I would like to be given the chance
6    to be a good citizen not only to society but to my
7    community because I know how to be; to be with my fiance,
8    my children and stepchildren, continuing to be involved in
9    all school and after-school activities and much more; and
10   of course, to be there for my mother for when she needs me
11   through her loving and sickest moments; to continue a
12   full-time employment as I once had prior to this issue.  I
13   just want to live a simple life, Your Honor.

14        Your Honor, I stand before you respectfully and
15   ask you to be lenient on my sentence to allow me to be
16   with my family once again.  I'm still a young man.  I have
17   my whole life ahead of me.  I refuse to have my past
18   struggles be my identity today.  That's not who I am and
19   that's not who I want to be.  I understand the image that
20   was painted of me today, Your Honor, is unacceptable, but
21   I'm a man that believes in change, something I strongly
22   believe in.  I put myself in a situation where I could
23   lose the people I love the most.  I'm also in a situation
24   where I don't get a chance to see my children due to
25   distance, and that's something I don't want.  I would just

1   like to be a better son to my mother, a better father

2   figure to my children and stepchildren, and not only a

3   better man for myself but to my fiancée.

4        Thank you for allowing me to speak, Your Honor.

5        THE COURT:  Sir, I have a couple of questions

6   for you, Mr. Diaz.

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  I'm wrestling a little bit with what

9   to make of -- and I give you credit for the fact that

10  you've taken part in the prison programs and you've

11  written very articulately about your desire to change.

12  I'm having some trouble understanding that in light of

13  some of the past.  Even when you were a young kid,

14  basically, you were 18 and 19 as we talked about, you get

15  a four-year sentence, you serve a lot of that.  You come

16  back out and, you know, by March of 2013 you're selling

17  out of your apartment again.  The agents come in,

18  Ms. Maldonado is there, according to the Presentence

19  Report she's there holding one of your young children, and

20  there's drugs in the apartment, and in the sock drawer

21  there's rounds of ammunition hidden in a sock.  That

22  paints such a picture of kind of heedlessness to me of

23  children and of family.  But you're arrested and

24  prosecuted for that.  And you end up getting yet more

25  prison time even though you have been through the system

1   once and had a taste of, hey, this is what prison is like.

2   And you go back into prison and then you come back out and

3   you're back at it again.  The only thing that's changed

4   is, heck, you've got more children to be responsible for.

5   And to your credit, I look at you and I say, okay, you are

6   caring, your children love you, and it's evident from

7   everything I've heard and even the drawings I've looked at

8   from the kids -- and they're wonderful kids -- but I say,

9   well, gosh, this guy's got talent, you had a job since

10  January of 2018 at Manpower, you're a machine operator,

11  you're making 15 bucks an hour, that's not a prince's

12  wages, I understand that, but then it's back to the drugs

13  again.  And it's not driven by some kind of raging

14  addiction that you have to do this.  And as far as I know,

15  the rest of your family members are, you know, busting

16  their tails to earn an honest living.

17         Why are you special?  Why do you get to break

18  the rules like that in ways that the rest of your family

19  doesn't?  Help me understand that.  What would drive you,

20  after two times already and you're up for the third time

21  again, to say, "hey, you know what, a good idea today is

22  I'm going to work and I'm also going to go sell the worst

23  of the worst drugs," basically?  Drugs are poison, but

24  boy, fentanyl, come on.  And you know it, right?  You're

25  in your conversations with Mr. Velez who you well know is

1    selling drugs and you're talking about "I'll have some

2    deadly and the regular stuff."  I can't help but think,

3    hey, that's fentanyl.  And so what you're saying is I love

4    my children, I love my family, I'm going to care for them,

5    but people who are not my family, people who are not my

6    children, have some death.  Have some death.

7            So that's what I have a hard time really

8    understanding.  And you're doing it for money.  You're

9    doing it just to make money.

10           So why are you so special?  Why are your kids so

11   special that you get to sell death to make money for them?

12           THE DEFENDANT:  Your Honor, as I stand before

13   you, I'm ashamed.  I'm actually -- my tongue is actually

14   tied.  There's no excuse for the decisions that I made,

15   because that's what it comes down to.  It was decisions.

16   I could have and I should have stood on the right path to

17   continue my employment.  Prior to my employment when the

18   offense occurred, times were hard, Christmas was around

19   the corner, I was doing well on probation, my head was

20   straight, I made a decision to sell drugs again.  Was I

21   desperate at the time?  I could admit that.  But it was a

22   decision that I made.  And does that make my kids any more

23   special for me to be around them rather than to sell it?

24   No.  I don't want to agree with that.  I feel that

25   selling, as you call it, death is unacceptable.  There

1   should be no excuse for the decisions that I made.

2          I am truly sorry for any of the victims that I

3   may have caused.  I would just like to move forward in

4   life and actually learn from my mistakes.  Once again,

5   being incarcerated this time, it's beating me up, it's

6   beating me up.  It's allowing me to look from the outside

7   in this time.  I know my past pattern has led me to be

8   here today in front of you, but I'm willing to break that

9   pattern and break that chain.  Like I stated before, I'm

10  in a position where I could lose my family due to my poor

11  decisions, something I don't want.  I'd just like to move

12  forward in life and leave everything in my past behind and

13  just rebuild a community that I once destroyed.  I believe

14  in change, like I've spoken before.  I believe that I can

15  renew myself.  I'm still young.  A lot of the harm I

16  caused, yes, was in my early adult age, experiencing

17  incarceration.  But I stand before you today, Your Honor,

18  and I apologize to the victims for any wrong that I have

19  done.

20          THE COURT:  So what's the fascination with the

21  Latin Kings?

22          THE DEFENDANT:  Your Honor, I was -- I became a

23  member of the Latin Kings at a very young age.  My

24  perspective of joining the Latin Kings was to uplift my

25  community.  It was a Latin community, oppressed people.

1   It doesn't necessarily mean nothing, but what attracted it

2   to me, Your Honor, at the time was the positive that I was

3   seeing: the food drives, the clothes drives, the

4   collecting hygiene and clothes and toys for the women that

5   are in shelters, hurricane victims.  This is what

6   attracted me to become a member of the Latin Kings.  It

7   wasn't any of the violence at all.

8            THE COURT:  The Latin Kings, do they do

9   violence?  Are they engaged in violence?

10            THE DEFENDANT:  I have never engaged in

11   violence, Your Honor.

12            THE COURT:  But are the Latin Kings as an

13   organization, do you know if dozens and scores of them

14   have been prosecuted in federal courts across the country

15   for engaging in acts of drug trafficking and violence?

16            THE DEFENDANT:  Yes, Your Honor.

17            THE COURT:  Do you suppose that if you were

18   dedicated to helping people and children and shelters,

19   homeless people and other good causes, do you think that

20   there might be another organization that one could join

21   that's not any of its member under federal indictment and

22   serving long federal prison sentences for drug dealing and

23   murder?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  So again, I ask, why the Latin

1    Kings?  You know this about them.  Why would you do this

2    and get involved with this organization?

3                THE DEFENDANT:  I was young, Your Honor.  I was

4    a very young man without guidance.  I was lost.  It was

5    something that -- it was in my environment at the time.

6    There was certain activities, the positive activities I

7    spoke about, it was a certain group that was there at the

8    time.  I was attracted to it at the time, Your Honor.  It

9    became a product of my environment at the time.

10                THE COURT:  Are you still attracted to the Latin

11    Kings?

12                THE DEFENDANT:  Your Honor, I'm a member of the

13    Latin Kings, I am today.

14                THE COURT:  Are you intending to go on and stay

15    with the Latin Kings' mission?

16                THE DEFENDANT:  Today I finally realize, or

17    prior to this, I know that my family is more important

18    than anything, any organization, any -- any jail sentence

19    that I am going to do or anything, I know that my family

20    comes before anything.  And to take care of them, to

21    provide for them as well.

22                THE COURT:  So tell me about the programs at

23    Wyatt that it sounds like you've done well.  Tell me about

24    what you've done at Wyatt.

25                THE DEFENDANT:  Since I was received at Wyatt, I

1    became a union worker at one of the pods over there.

2    While I was being a unit worker, I was continuing programs

3    for substance abuse.  I was volunteering for other jobs in

4    the facility.  I was actually being given a chance to be a

5    part of the captain crew worker.  That's one of the best

6    jobs in the facility.  I still have the job there as we

7    speak.

8              As far as attending and participating in the

9    project awareness program, something that I wanted to do

10   was something that me having children and me having

11   children that's becoming teenagers, they're growing up

12   very fast, Your Honor, I wanted to learn to guide them in

13   a better form of, you know, just give advice to these

14   children that are in group homes, children that are in

15   schools that might even think about engaging in street

16   activity.  It was a great program.  I was grateful to be a

17   part of it, to speak to these children.

18             But other than that, Wyatt has been treating me

19   really, really good, as far as programs, as far as being a

20   part of the detainee worker program.

21             THE COURT:  Whatever sentence the Court imposes

22   today, there's going to be a day when you get out and

23   you're starting your life over and you're back with your

24   kids, your very supportive family and your mom.  Tell me

25   what's -- what would you like to be doing?  Where do you

1    see yourself a year after you're out?

2           THE DEFENDANT:  Sometimes I think about on a

3    daily basis, Your Honor, as I stated to you, I just want

4    to live a simple life.  To maintain employment, continue

5    to go to after-school activities with children, something

6    I was very much involved in.  And just go home.  I stated

7    to you family is a lot more important than anything, the

8    love for them, the love that they give me as well.  Just

9    live a simple life, Your Honor.  Go to work, come out, and

10   stay with the children.  It's a gap that's missing right

11   now in my life, Your Honor.

12          THE COURT:  What kind of career are you going to

13   build so that you're not feeling the temptation to sell

14   drugs to make money?

15          THE DEFENDANT:  I very much look forward to work

16   in a trade that I can start at BOP, looking forward to

17   that as well.  But to receive a trade, HVAC, something I'm

18   really looking forward to.  I tried cosmetology in the

19   past, it didn't work out as much as I wanted it to.  But

20   something to make good money, something to provide the

21   family for, something where I don't have to go into the

22   streets anymore, Your Honor, something that I don't have

23   to repeat my pattern again.  Just looking forward to it.

24          THE COURT:  So smoking marijuana, not the worst

25   crime that there is, but it's something that will warp

1    your decision making.  Do you understand that?

2              THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

3              THE COURT:  So do you understand that when

4    you're out, you actually have to tackle that, address

5    that.  You'll be tested, believe me.  You haven't been on

6    federal probation yet, or on supervised release, but

7    you'll be tested regularly, randomly.  I get reports back.

8    I'll understand when I see reports, if I see reports,

9    hopefully not reports that Mr. Diaz is testing positive or

10   not showing up for tests or skipping out on treatment,

11   I'll understand that to say, okay, this is somebody who is

12   not so serious and maybe is off doing other stuff.  Do you

13   understand that you're going to --

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  -- you're going to need to change

16   that basic pattern?  As much as sort of smoking a joint

17   can give you some relief recreationally, and many people

18   do it, it still ends up meaning you make different

19   decisions than if you're not smoking marijuana every day.

20             THE DEFENDANT:  I agree, Your Honor.  I agree.

21             THE COURT:  Is there anything else you want me

22   to know?

23             THE DEFENDANT:  I feel confident, just one thing

24   for future reference, Your Honor, just to be with my

25   family once again, Your Honor.  Just be with my family.

1          THE COURT:  Okay.

2          THE DEFENDANT:  I know the importance of that.

3  To disappoint you in the near future is not my intention.

4  It won't be.

5          THE COURT:  Thank you, sir.

6          THE DEFENDANT:  Thank you, Your Honor.

7          THE COURT:  Ms. Levy, do you have anything else?

8          MS. LEVY:  This is his sister, Sandra Lopez.

9          THE COURT:  Come on up.

10          MS. LOPEZ:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MS. LOPEZ:  I don't have anything typed up or

13  written or composed.

14          With my parents in the background and my mom

15  hearing some of the things that were said, I am sure it's

16  a shock to even her hearing half the things that Sam did,

17  with what Ms. Levy said.  Not that there's two different

18  people, but when it came down to I guess the street life,

19  Sam separated that from family.  I know probably more

20  about him than both my parents that are sitting back

21  there.  I'm very close to him.  I was there when his

22  children were born.

23          I know a lot about Sam.  I don't make excuses

24  for him.  I read the report.  I've read the 120-page

25  investigation, I read it.  Again, I don't make excuses for

 1    him, but -- and I read the proposed sentence.  As you see

 2    from his reports where he's at now at Wyatt and previous

 3    probation reports, it's amazing how when faced with I

 4    guess a mandatory obligation, Sam goes above and beyond.

 5    When he's faced with not being around his children, he

 6    does these programs to go above and beyond.  That's how I

 7    think he will be when he comes home.  He will go above and

 8    beyond, because now he has to prove himself even more.

 9    Not to me, not to his family: to himself.

10          Sam's been in and out of I guess I say criminal

11    activity, but he has a history in the last ten years.  Sam

12    just turned 31.  I'm only a few years older than him.  I

13    just feel like -- I'm not blaming my parents at all, but

14    he needed to make his own decisions and trying to find his

15    way in life, living in the projects, being a young father,

16    having a hard time finding jobs being a convicted felon

17    led to his decisions.

18          And then I hope that maybe when he does come out

19    there are programs that will help even more.  That's

20    something that I'm even interested in, because I know the

21    struggle for a convicted felon, whether state or federal,

22    how hard it is to move on.

23          And I read that the guidelines between 46 and 57

24    months are considered.  I just hope that you give him the

25    minimum so -- I'm not saying move on, but he's still

 1    young.  I think with the mandatory drug screening, the

 2    programs that you guys are willing to offer, it will

 3    benefit him three, four years from now.

 4            THE COURT:  I hope so.

 5            Are you working yourself?

 6            MS. LOPEZ:  I work.

 7            THE COURT:  What area?

 8            MS. LOPEZ:  Property management.

 9            THE COURT:  Property management.

10            Help me understand what you think went on with

11    your brother that he couldn't simply just work lawfully,

12    get a real job and not sell drugs.

13            MS. LOPEZ:  Easy money.  It's the easy way out.

14    And it wasn't consistent, I know that.  There were times

15    that he did have a job.  I found him temp jobs and he

16    would do good.  I think just trying to keep up with

17    growing children, and Johanna is a homeowner now.  There's

18    bills, maintenance, day-to-day.  There's no government

19    assistance.  There's no Section 8.  Fast money.  Easy

20    money.  And I think with him not knowing what he really

21    wanted to do up until when all this investigation began,

22    he was working.  I think he just needed to find his way in

23    what he really wants to do.  That's something I'm willing

24    to help him to figure out what trade, what job, what do

25    you want in life.  I think at his age, he needs to hurry

1   up and figure it out.  I think with our support, he will,

2   and with this sentence or program that you guys have

3   available for him.

4           THE COURT:  There's many different programs.

5   There's substance abuse programs.  There's mental health

6   counseling, if that's something.  There's something called

7   Reentry Court, Support Court, basically working with --

8   Ms. Levy would be familiar with and could tell you much

9   more about.  So there will be lots and lots of programs.

10  The federal probation officers are very engaged with

11  everybody who comes out in trying to connect them with

12  those programs if they're committed.  It takes them

13  themselves.  It's never the program; it's really the

14  person who decides that they're going to take advantage of

15  the program and use the program as a platform.

16          But I can't help but wonder, as I look back at

17  what happened, say, in 2013 when he was arrested and the

18  police are literally riffling through his sock drawer in

19  his apartment, his kids are there, Ms. Maldonado is there.

20  I can't imagine that your family didn't get together much

21  like they're together today and say how do we stop this

22  from ever happening again.  Maybe they did.  Maybe they

23  didn't.  But they've given me some pause here that I'm

24  concerned about.  I say, okay, gosh, that was just a few

25  years ago.  He paid a heavy price then.  He's back at it.

1    Despite all the family support.  Despite the kids.  What

2    would be different this time?

3            MS. LOPEZ:  Time.  Gives him time to really

4    think it about again.  And just going through this

5    process.  The federal system is a lot different than the

6    state.  The entire procedure, even me speaking to you

7    versus going to a state court and just defendant,

8    prosecutor, okay, this is what he done.  I understand he

9    needs repercussions for his actions.  He understands that.

10   We understand that.  I just think time.  Not too much, but

11   some time will help.

12           THE COURT:  All right.  You're a great sister.

13   Thank you for coming in.

14           MS. LOPEZ:  Thank you.

15           MS. LEVY:  Thank you.

16           THE COURT:  Thank you.

17           Mr. Leaming.

18           MR. LEAMING:  Thank you, Your Honor.

19           Many of the Court's pointed questions to

20   Mr. Diaz and Mr. Diaz's sister were obviously at the

21   forefront of the government's thoughts, some of which I've

22   outlined in the sentencing memorandum.  I had a couple of

23   additional observations.

24           Mr. Diaz is like many individuals that have

25   happened before Your Honor.  He has a family, obviously

1    they're here, they care for him, they've been with him

2    since he came onto this earth.  And it's not surprising to

3    hear Mr. Diaz talk about how important his family is to

4    him.  He's certainly motivated.  Many defendants are

5    motivated when they appear in federal court for

6    sentencing.  The question is, what is he motivated about?

7    What is he motivated for?  He certainly has a strong

8    self-motivation to present to the Court the best possible

9    picture he can present in hopes of gaining leniency.

10   Understandably, Mr. Diaz wants the lesser sentence he can

11   possibly get and he's going to present, as many defendants

12   do, the best possible picture to convince the Court of

13   that.

14          There's inherently obviously a self-interest

15   there.  I don't want to go to jail for that long, so I'm

16   going to try to do and say the right things to make that

17   happen.  So he's motivated to do those things and to say

18   the things that he said.  One of the things that struck me

19   from the first 15 seconds of his comments to the Court is,

20   how is this person not able to get a job and be a

21   productive member of the community?  Someone that can

22   prepare thoughtful comments to the Court, that has clearly

23   a strong family that's here to support him in any way that

24   he needs support.  How is it that he's even here?  He

25   clearly has the ability and the skills and intelligence to

1    do something greater.  So what does that ultimately say

2    about him?  That he's decided he'd rather, as his sister

3    said, make easy money.  And why I find it hard to credit

4    his representations of change is a lot of what the Court

5    intimated with questions to his sister.  I don't look just

6    back at 2013.  I look back at 2015.  He's out again on

7    parole, he's been given opportunities through the state

8    judicial system, participated in employment program,

9    successfully completed an inpatient drug program.  He went

10   to a cognitive behavioral program.  I think through the

11   entire time of his supervision up until his arrest he had

12   one positive urine for marijuana.  So clearly it's

13   something he's able to manage.  It's not pushing him into

14   a direction.  These are decisions that he's making.

15          I listened to his comments about the social

16   aspects of the Latin Kings.  He's not the first person

17   I've heard say that, and I didn't believe the other person

18   when they said that's why they joined the Latin Kings.

19   Everyone knows why you join the Latin Kings.  It's a

20   criminal organization.  You don't join it to do

21   fundraisers or toy drives.  You do it so you can hang out

22   with other criminals and engage in organized criminal

23   activity.

24          I thought it telling that he didn't disclose to

25   Probation some of the tattoos on his body that reflected

1    his prideful association with the Latin Kings.  He

2    displays it in his house.  He has "Hoodfella" tattooed on

3    his body because that's really what he wants to be.

4    Because that's really who he is.  And so I think about

5    2015 and 2016 when he's receiving the treatment and the

6    programming and he knows that if he gets caught again he's

7    looking at another seven years on his violation of

8    probation, and he knows more than perhaps most people know

9    that if he violates he'll probably go back for seven years

10   because he knows when he was 19 that four-year suspended

11   sentence came all the way back to him and he got four

12   years in prison when he violated his probation.  So he

13   knew and had all of the same motivations that exist today

14   existed in 2015, 2016, and 2017, and the prospect of

15   spending another seven years in jail did not dissuade him

16   one bit.  The prospect of leaving all of those family

17   members that are here today for seven years did not

18   dissuade him one bit.  Because that's who he is.  That's

19   the choice he made.  It doesn't make him an evil person.

20   It doesn't make his feelings of his family any less.  I

21   have no doubt that he loved his family then as he does

22   now.  But the conscious choice that he made was his

23   choice.  His decision of separating himself from his

24   family was his own decision.  He knew the risks and he

25   chose the Latin Kings and drug dealing over his family.

1    And that's why he'll continue to present a danger to the

2    community.  So long as he associates or wants to be a

3    member of the Latin Kings or proudly displays it in his

4    living room, he will return to criminal activity.

5            And the fact of the matter is in 2015, 2016, and

6    2017, he knew that back then just as he knows it today in

7    2019.  And it's that conscious disregard, that obvious

8    choice, when you know in your brain that you don't

9    actually have to do it, you don't actually have to do

10   this.  As his sister said, she helped get him jobs, he had

11   a job.  But he'd rather sell deadly in his own community

12   where his kids grow up.  I'm quite certain that if he

13   found out that some other guy in his community was selling

14   fentanyl to his kids, and how many overdose deaths are

15   going to be prosecuted until he realized that his drugs

16   are likely killing people.

17           And for all of those reasons, Your Honor, I

18   don't think we can give him the benefit of the doubt.  I

19   don't think we can take his words at face value.  His

20   conduct and his motivations are apparent from his actions.

21   And for those reasons, Your Honor, the government does

22   believe that a sentence of 57 months is necessary.

23           THE COURT:  Thank you, Mr. Leaming.

24           Ms. Levy.

25           MS. LEVY:  First, I'd like to address some other

1    issues that were mentioned in my sentencing memorandum and

2    then get back to the Latin Kings issue.

3            THE COURT:  Certainly.

4            MS. LEVY:  The probation officer has strongly

5    recommended the RDAP program in the Bureau of Prisons,

6    residential program.  We still believe that that would be

7    extremely helpful and beneficial to Mr. Diaz.  That would

8    enable him to use his time in federal prison in a useful

9    way and set him on a path which would hopefully be a

10   strong one for the future.

11           My understanding is that the RDAP program is

12   available in Danbury.  That would be our first choice for

13   designation in order to be able to have Mr. Diaz remain in

14   contact with his family.  If not, probably a second

15   choice, based primarily on geography, would be FCI

16   Otisville in New York.

17           Throughout the presentence investigation report

18   and my sentencing memorandum there was discussion about

19   the family support, about his sister Sandra and fiancée

20   Johanna and Kristal, the mother of his family, and the

21   fact that his mother, Carmen, would show up in federal

22   court.  And all of those people are here.

23           The person who has not been here previously and

24   we are very glad to see here is his father, Samuel Lopez,

25   who is seated --

```
 1               THE COURT:  In the far back there?

 2               MS. LEVY:  -- in the second row to his right.

 3               And the kind of family support that there is

 4    beckons well for someone's reentering the free world

 5    community.

 6               I understand the government is skeptical.  Well,

 7    is there no hope at all for Mr. Diaz because he has had

 8    the background that he's had?  I think that there is hope.

 9    I think that he's going to try real hard and that he tries

10    harder when there's confidence from the Court, when

11    there's confidence from his family.

12               And speaking of Latin Kings, I have never heard

13    from Mr. Diaz the explanation that Latin Kings were a

14    family for him.  It is my understanding that both the

15    Latin Kings and other very major gang organizations do in

16    fact, among other things and despite their admitted

17    criminal activities, function as a family structure for

18    individuals who don't have that in their own lives.  And

19    while we are very glad to have Carmen and Samuel here, his

20    mother and father here today, when Mr. Diaz was growing

21    up, they were not able to provide the substantial kind of

22    family life that he is trying real hard to provide to his

23    children and stepchildren.  And I could be wrong, but I do

24    think that there is an aspect of family that was

25    attractive to Mr. Diaz as a young man when other aspects
```

1    of his life were not providing that kind of family that we

2    would want for our own children.  And we are hoping that

3    the Court will see its way clear to a non-guidelines

4    sentence.

5              THE COURT:  Thank you very much.

6              So I appreciate the comments of all counsel.

7    I'm going to turn to the imposition of sentence at this

8    time.

9              Mr. Diaz, I'm required under the law to consider

10   a large number of factors.  Of course, I have to think

11   about what it is that brings you into court and what's

12   brought you into court before, unfortunately.  I have to

13   think as well about the other positive aspects that I've

14   learned about you and your family and some of the

15   challenges you face.  And we haven't talked about all of

16   them, but they're described in the Presentence Report and

17   I've certainly thought about them.

18             I have to think about what are the purposes of a

19   criminal sentence.  Congress tells me essentially the

20   purposes include what will reflect the seriousness of an

21   offense like this kind that we talked about; what would

22   promote respect for the law; what would be just

23   punishment; what would defer or discourage you and others,

24   frankly, from making the wrong choices for the easy money,

25   as it were; what would help you in terms of incapacitating

1  or, rather, capacitating, excuse me, rehabilitation in

2  terms of supporting your effort, I hope, to make different

3  choices in the future, some of which I see you're already

4  starting in that direction.

5           I have to think about the Sentencing Guidelines

6  and what they recommend here.  They're not binding on me,

7  but I have to think about them, consider them.

8           Basically, I have to think about everything I

9  know and I've learned about you, both the "good" and the

10 "not so good" as we talked about, and to decide on a

11 sentence that's fair and just and reasonable, also one

12 that's not greater than necessary to serve those purposes

13 of sentencing that I've just talked about.

14          For you, I think you've already heard my

15 concerns.  I haven't minced words on this.  I'm very

16 concerned that you would sell this very lethal substance

17 that you knew to be lethal, "deathly" is your words, and

18 that you did it for basically mercenary motives, even if

19 it's just helping your kids.  That's not a reason that you

20 sell out and endanger other children or parents of other

21 children.

22          I'm concerned as well about the failure to learn

23 from the other chances you've had, albeit in the state

24 criminal justice.  And accepting even your sister's

25 description how that process is different there, and I

1   understand it is different, but still there were days of

2   judgment and reckoning, and you had clear opportunities to

3   make different choices than what you decided to do.  So

4   that's the concern I've got there.

5          The concern on the other side, in terms of

6   what's mitigating, I know that you have faced challenges.

7   Your dad has faced challenges, and I've learned about

8   that.  You grew up in an environment where you did not

9   have as much parental support, I'm thankful that you have

10  it now, but you had some years there where it wasn't as

11  ready for you.

12         I also see that you have given thought to what

13  you want to say today.  I understand Mr. Leaming's point,

14  you're here to say anything you can, but also I think it's

15  genuine as well that you have given thought, and I credit

16  that as well.  I hope the words are sincere.  They seem to

17  me to be sincere.

18         I also credit your family support that you have

19  here.  It's evident.  You've heard my concerns about why

20  that didn't make the difference before, but nonetheless,

21  it's still a positive factor.  You're a good father.

22  That's a good important thing.

23             THE DEFENDANT:  Thank you.

24             THE COURT:  Your kids love you and they want to

25  be with you and see you.  That's something nobody can take

1    away from you in that sense.  You're always a father no

2    matter where you are.

3             I've considered as well in the sentence that I'm

4    going to impose somewhat of the issue of the criminal

5    history issue that I talked about before in terms of its

6    effect on the overall recommended range here of

7    imprisonment.

8             Overall, as I look at everything here, I'm

9    convinced that a substantial term of imprisonment, not

10   quite as much as the government is asking the Court to

11   impose, in large part in recognition to your words today,

12   Mr. Diaz, your actions that you've taken at Wyatt, lead me

13   to conclude that I shouldn't impose the absolute max that

14   the government is asking me to conclude.  But I'm also not

15   persuaded, on the balance of all that I'm looking at here,

16   that I should impose a sentence that's less than, frankly,

17   what the range is that the probation office has

18   recommended.  I'm looking at all the pluses and minuses

19   here.  And I'm just concerned about what is just

20   punishment, the drugs you were selling, the kinds of drugs

21   you were selling, and not leaving you with any impression

22   that going back to selling again is an option that

23   wouldn't be faced with severe consequences again.

24            So I'm going to have you stand at this time,

25   sir, for purposes of imposition of sentence.

1            Mr. Samuel Diaz, for the reasons I've explained,

2    I'm sentencing you to a prison term of four years of jail

3    time, prison time.  That's 48 months.  That will be

4    followed by a term of supervised release of three years.

5    That will include the standard conditions of supervised

6    release under 5D1.3(c), the mandatory conditions which

7    include that you not commit another state, local, or

8    federal offense; that you not possess, unlawfully possess

9    any kind of controlled substance; that you shall refrain

10   from any unlawful use of a controlled substance, and of

11   course that includes marijuana, and submit to a drug test

12   within 15 days of release on supervised release and at

13   least two periodic drug tests thereafter for use of a

14   controlled substance; and you'll have to also cooperate in

15   the collection of a DNA sample.

16           I'm also imposing special conditions of

17   supervised release that include, as we've discussed the

18   special conditions that we discussed before, that you not

19   communicate or interact with any known member of the

20   Latin Kings gang without first obtaining the permission of

21   the Probation Office.  If there's somebody you know to be

22   a member, somebody that you're close to for some reason

23   other than that, it's something you bring up to the

24   Probation Office, I want to talk to this person.  You may

25   have a bond to this person.  And the probation officer can

1   consider that and, if necessary, it can be raised with the

2   Court on that.  But the concern we've heard already about

3   the Latin Kings is a considerable one here.  I'll make it

4   explicit that this condition does not apply under any

5   circumstances to Ms. Johanna Vega, your partner.  And

6   again, if there's other people that you're concerned about

7   with respect to that, you can raise that with the

8   probation officer.

9           I'll require that you submit your person,

10   residence, office, or vehicle to a search conducted by

11   U.S. Probation Officer in a reasonable time and reasonable

12   manner based upon reasonable suspicion of contraband or a

13   violation of condition of supervised release.

14           I'll also require that you participate in a

15   program recommended by the probation office and approved

16   by the Court for inpatient or outpatient substance abuse

17   treatment and testing.

18           I'll also be making a recommendation, as

19   Ms. Levy has suggested, to the RDAP program.  But this is

20   afterwards, because making sure that you're not affected

21   by drugs, because you've had a lot of history there going

22   way back, is going to be very important to you making

23   better decisions in the future.  We'll do all we can to

24   support that.

25           And the next is that you not possess a firearm

1   or ammunition or any other dangerous weapon.

2           So those are the conditions of supervised

3   release.

4           I'm not imposing a criminal fine because I think

5   you should be saving your money and supporting Ms. Vega

6   and supporting Ms. Maldonado in all that they do for your

7   kids and your house.

8           I will impose the $100 special assessment.

9           I'll make the recommendation for the Residential

10  Drug Abuse Treatment Program.

11          And I'll also make a recommendation for

12  designation to FCI Danbury or, if that's not available, to

13  FCI Otisville, as requested by Ms. Levy.

14          So I'll ask all counsel, is there any reason,

15  apart from whether you agree with the sentence, whether

16  the Court lawfully cannot impose the sentence I've just

17  imposed?

18          MR. LEAMING:  I believe it's a lawful sentence,

19  Your Honor.

20          THE COURT:  Ms. Levy?

21          MS. LEVY:  I have no disagreement with that.

22          THE COURT:  Okay.  So the judgment of the Court

23  will be prepared for my approval by the Clerk's Office.

24          So Mr. Diaz, you do have the right to appeal

25  under certain circumstances that may be limited by your

1    plea agreement.  I think it is, but if you wish to file

2    any kind of appeal from the conviction or the sentence in

3    the case, you need to do so within the next 14 days.  And

4    if you could not afford counsel to represent you, you'd

5    have counsel appointed to represent you.  So you just want

6    to consult with Ms. Levy right away about those options if

7    that's something you want to do.  But 14 days, you have to

8    act within that period.  Do you understand that, sir?

9             THE DEFENDANT:  Yes, Your Honor.

10             MS. LEVY:  Excuse me.  I need to inform my

11    client and the Court on the record that under the terms of

12    my CJA appointment, I am required to represent Mr. Diaz on

13    appeal if there is to be an appeal.  And I will discuss

14    that with him as soon as we're finished with the court

15    matters.

16             THE COURT:  I understand.  All right.

17             Anything else to take up at this time?

18             MR. LEAMING:  No, Your Honor.

19             THE COURT:  I think we have pending Counts 24,

20    25, and 26, possibly?

21             MS. LEVY:  Mr. Diaz asks whether the Court would

22    permit his mother to hug him.

23             THE COURT:  That's a matter left to the

24    discretion of the U.S. Marshal Service.  I leave that to

25    the Marshal Service to decide if they wish to allow that.

1          MR. LEAMING:  I believe that's correct,

2     Your Honor, sorry, to go back to the earlier inquiry.  It

3     looks like he's charged in Counts 24 through 26.  The

4     government would move to dismiss those counts at this

5     time.  Thank you.

6          THE COURT:  24, 25, 26 are dismissed at this

7     time.

8          Anything else?

9          Thank you all.  Stand in recess.

10          (Proceedings adjourned at 11:42 a.m.)

1

2                     C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. SAMUEL DIAZ

5                    No. 3:18CR90(JAM)

6

7            I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 53 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____/s/_____

18                    DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
19                    United States District Court
                      141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                          (860) 463-3180
21

22

23

24

25